STEVEN G. KALAR
Federal Public Defender
Northern District of California
ELISSE LAROUCHE
Assistant Federal Public Defender
19th Floor Federal Building - Box 36106
450 Golden Gate Avenue
San Francisco, CA 94102
Telephone:   (415) 436-7700
Facsimile:    (415) 436-7706
Email:          Elisse_Larouche@fd.org

Counsel for Defendant Kelley

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>JUSTIN KELLEY,<br><br>Defendant. | **Case No.:** CR 18–00532 MMC<br><br>**SENTENCING MEMORANDUM**<br><br>**Court:**           Courtroom 7, 19th  Floor<br>**Hearing Date:**  September 2, 2020<br>**Hearing Time:**  2:15 p.m. |

i

**TABLE OF CONTENTS**

**INTRODUCTION** ............................................................................................................................. 1

**FACTUAL BACKGROUND** .......................................................................................................... 2

**ARGUMENT** .................................................................................................................................... 2

    I.    The 3553(A) factors call for a variance in this case. ........................................................ 3

        A.    Mr. Kelley's personal history calls for a downward variance. .............................. 3

            1.    Mr. Kelley lacked youthful guidance. ......................................................... 3

            2.    Mr. Kelley served in the military, bringing back the physical and mental pain of war. ................................................................................................... 5

            3.    Addiction to prescription drugs and then street drugs and Mr. Kelley's altered mental state led to his commission of the instant offense. ............. 7

            4.    Since receiving treatment, Mr. Kelley has demonstrated significant pre-sentence rehabilitation. ................................................................................ 8

        B.    The other 3553(a) factors, including the nature of the offense, the need for deterrence, protection of the public, and Mr. Kelley's need for medical and effective correctional treatment, also suggest that a variance is appropriate. ...... 10

**CONCLUSION** ............................................................................................................................... 11

# INTRODUCTION

Defendant Justin Kelley put his body—physically and mentally—on the line while he served with the United States Marine Corps in two tours in Afghanistan. Being in the military gave him a sense of family that he lacked in his tumultuous childhood. But, being in the military also came with its costs. Mr. Kelley had injuries and pain. For this, he sought medical treatment and was given prescription pain medications. Eventually, his treatment providers would no longer prescribe the same level of medications. His physical pain lingered and was intensified by the addiction he had developed. Mr. Kelley then lost his partial-custody of his young daughter, who was "his life." That emotional pain, along with the memories from his traumatic childhood and life at war, continued untreated but for his self-medication. Mr. Kelley landed at rock bottom when he was found slumped over and injecting a street drug mix of heroin on the side of the freeway in July 2018, leading to the instant offense. His life dragged along, unable or unwilling to confront his issues, until he appeared on the present matter and was released to Newbridge treatment center in July 2019. Mr. Kelley is done hiding. Done with hiding from memories of physical and sexual abuse in his childhood, done with hiding from the pain from his mother abandoning him, and done with hiding from what he saw while deployed. Through treatment, he is reckoning with his demons, and he has shown he can appropriately work through that history and maintain his sobriety in the real world.

After 20 months of sobriety, but-for one instance of cocaine use, Mr. Kelley is poised to keep making gains in treatment and contribute to society as he once did in the military. He respectfully asks the Court to consider his history and characteristics, including his lack of youthful guidance, military service, physical and mental condition, his drug dependence at the time of the offense, and his remorse and pre-sentence rehabilitation as grounds for a variance in his case. Further, a variance is warranted because it is evident that the sentencing goals of deterrence and protection of the public are best served by Mr. Kelley continuing to receive mental health treatment, which is yielding positive behavioral changes. *See* 18 U.S.C. § 3553(a)(2)(B), (C). For the same reasons, in considering Mr. Kelley's need for medical care and correctional treatment per § 3553(a)(2)(D), a variance is also appropriate so he can obtain the best level of care out of custody, especially with a possible lack of full BOP services due to the COVID-19 pandemic.

Pursuant to the plea agreement, Mr. Kelley asks the Court to impose a sentence of 24 months prison. Probation has recommended a sentence of 18 months. PSR Sentencing Recommendation at 1.

## FACTUAL BACKGROUND

Mr. Kelly is a deeply loyal and altruistic man. After a childhood that can aptly be described as nightmarish, he graduated high school, attended some college, and then enlisted in the military. After serving five years, he was honorably discharged in 2013. He struggled with adapting to civilian life, but the birth of his daughter, Shannon, brought him his biggest joy. Watching her grow and caring for her brought him a new feeling of happiness and he again was able to play the role of protector—something that is second nature to him. His marriage, however, struggled and became embittered. Around this same time, Mr. Kelley's use of the prescription pain medication was discontinued. This is when his illicit drug use began. His addiction escalated, he lost custody of his daughter, and began to feel there was nothing left for him.

When he was arrested in the instant offense, Mr. Kelley was forthcoming with officers. He was found slumped over with syringes nearby—he couldn't function without drugs at that time. He told officers this when they found him, told them there were guns in the car, and then told them he was driving the marijuana for a friend to make some money. Mr. Kelley was doing so to fund and fuel his addiction. Mr. Kelley's addiction brought out the worst in him. But, he is so much more than his addiction. He is a loving father who took his young daughter to ballet classes. He is a partner to his fiancée who has stood with him, knowing the good man he is, despite the rocky years of addiction. And, Mr. Kelley is one of those people that others call for help, whether to volunteer for a charity or to help fix a flat tire. He likes helping, he likes serving, and he likes being productive. That is Mr. Kelley.

## ARGUMENT

This Court is familiar with the directives of *United States v. Booker*, 543 U.S. 220 (2005) and 18 U.S.C. § 3553. While the Court must consult with the Guidelines and take them into account when sentencing, the Guideline range is not presumed to be reasonable. *United States v. Cantrell*, 433 F.3d 1269, 1279 (9th Cir. 2006); *see also Gall v. United States*, 552 U.S. 38, 49–50 (2007); *United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008) (en banc). A sentence outside of the

guideline range does not require "extraordinary" circumstances; instead, it is within the district court's discretion to arrive at an appropriate sentence in the particular circumstances. *Gall*, 552 U.S. at 47. The Court's paramount concern must be to "'impose a sentence sufficient, but not greater than necessary' to reflect the seriousness of the offense, promote respect for the law, and provide just punishment; to afford adequate deterrence; to protect the public; and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment." *Carty*, 520 F.3d at 991. Here, a below-guideline sentence, in conjunction with supervised release that includes treatment conditions, will achieve the goals of federal sentencing and be sufficient but not greater than necessary.

## I.  The 3553(A) factors call for a variance in this case.

In its recommendation to the Court, Probation notes that a variance down to 18 months from the guideline range is warranted in this case. *See* PSR at Sentencing Recommendation. Pursuant to the plea agreement, Mr. Kelley respectfully requests a sentence of 24 months and likewise notes the factors acknowledged in probation's recommendation, which merit a downward variance in his case.

### A.  Mr. Kelley's personal history calls for a downward variance.

#### 1.  Mr. Kelley lacked youthful guidance.

When Mr. Kelley was only two years old, his mother abandoned him. PSR ¶ 51. His biological father was not in the picture. *See id*. His first memories as a child are of abuse and chaos in Salt Lake City where he lived with his step-sister's father, Michael Kelley, whom he believed was his biological father. *Id*. The conditions there were jarring. *See* PSR ¶¶ 51–52. Mr. Kelly has only recently been able to share the horrors he experienced. The home with Michael Kelley was a place for people to make and use methamphetamine. PSR ¶ 52. Drug addicts and bikers freely flowed in and out of the home and used drugs. *See id*. There was no stable, positive parental figure, especially as Michael used drugs and was often in prison. PSR ¶ 51. The adult attention that Mr. Kelley did receive, was abusive. He was sexually abused by numerous female and male adults who used drugs and stayed in or passed through the home. PSR ¶ 52. Sadly, older children in the home, who may have suffered similar abuse, had the younger children engage in inappropriate sexual conduct. *Id*. In addition to sexual abuse, Mr. Kelley was physically abused with fists, rods, a BB gun, and belt

buckles. *Id*. This nightmare ended at around age six when he moved out of the Salt Lake City home. *Id*. While his situation improved, it remained tumultuous.

After briefly returning to his mother, it was evident she could not care for him given her continued use of drugs. A man who was not even Mr. Kelley's blood relative—his step-sister's grandfather, Gene Kelley—stepped in and took Mr. Kelley in for several years. PSR ¶ 54. While Mr. Kelley has recently made peace with Gene, Gene was ill-equipped to raise children and sometimes resorted to physical violence to try to control a young Mr. Kelley. *Id*. Mr. Kelley felt alone and abandoned and he began to act out. PSR ¶ 55. At around age 12, he left Gene's home and bounced around different "family" members' homes, including stints with his biological father and later, mother. PSR ¶ 56. In his adolescent, without any stable guidance or home, he had behavioral issues and used marijuana starting at age 11, a further sign of neglect. PSR ¶ 55, 74. He showed he could persevere, however, and graduated high school and started college courses. PSR ¶ 57.

Not surprisingly this upbringing has deeply damaged Mr. Kelley. Scientists have observed connections between childhood trauma like Mr. Kelley's and neurological deficits. There is a growing body of peer-reviewed studies linking Adverse Childhood Experiences (ACEs) with long-term changes in the brain. Anda, Felitti, et al., *The enduring effects of abuse and related adverse experiences in childhood: A convergence of evidence from neurobiology and epidemiology,* Eur Arch Psychiatry Clin Neurosci. 2006 Apr.; 256(3): 174–86,[1] (concluding that "[t]he graded relationship of the ACE score to 18 different outcomes[2] in multiple domains theoretically parallels the cumulative exposure of the developing brain to the stress response with resulting impairment in multiple brain structures and functions."). An article in *The Atlantic* discussed this research, noting the pioneering work of physicians Anda and Felitti, cited above:

> Unpredictable childhood trauma has long-lasting effects on the brain. Studies have shown that people with adverse childhood experiences are more likely to suffer from mental- and physical health disorders, leading people to experience a chronic state of high stress reactivity. One study found that children exposed to ongoing stress released a hormone

---

[1] Available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3232061/
[2] These 18 areas were subcategories of the following: Mental Disturbances; Somatic Disturbances; Substance Abuse; Impaired Memory of Childhood; Sexuality; and Perceived Stress, anger control, and risk of intimate partner violence.

>that actually shrank the size of their hippocampus, an area of the brain that processes memory, emotion, and stress management. Individuals who have experienced emotional or physical neglect by a parent are also at a greater risk of suffering from chronic illness as adults.
>
>…
>
>'Chronic, unpredictable stress is toxic when there's no reliable adult,' said Donna Jackson Nakazawa, the author of Childhood Disrupted and a science journalist who focuses on the intersection of neuroscience and immunology.

Cindy Lamonthe, *When Kids Have to Act Like Parents, it Affects Them for Life*, The Atlantic, Oct. 26, 2017.[3] Mr. Kelley has suffered from several ACE's, some brief and some enduring, including physical and sexual abuse and abandonment that characterized his childhood. *See* PSR ¶ 51–56. He also parented himself in the absence of a stable, responsible adult.

In sum, research suggests that Mr. Kelley entered adulthood with the neurological impacts of his stressful upbringing. This past contextualizes his fall into addiction and his criminal behavior. It is clear that his origins will continue to have continuing effects, but Mr. Kelley is now processing through therapy and healthy coping mechanisms. His behavior since his pre-trial release in this case shows he is capable of stability.

### 2. Mr. Kelley served in the military, bringing back the physical and mental pain of war.

Searching for something meaningful to do with his life, Mr. Kelley courageously enlisted in the military at age 21. PSR ¶ 57. He served with the Marine Corps from 2008 to 2013, including two tours in Afghanistan. PSR ¶ 82. Mr. Kelley had physical prowess that made him standout, technical skills as a mechanic, and obtained various military decorations. *See* Larouche Decl., Ex. A; PSR ¶ 82. Mr. Kelley's fiancée, Melissa Russell, notes that he found a "brotherhood" with those he served alongside in the military. PSR ¶ 58. He was also able to practice his desire to serve through humanitarian projects such as installing running water and building schools in Afghani villages. *Id*.

His time in the military also left Mr. Kelley with physical and emotional wounds. He receives Veterans' disability benefits for his numerous physical injuries and has pain and complications from scoliosis and neck, shoulder, back, knee, and ankle pain. Larouche Decl., Ex. B; PSR ¶ 84. The pain

---

[3] Available at https://www.theatlantic.com/family/archive/2017/10/when-kids-have-to-parent-their-siblings-it-affects-them-for-life/543975/

SENTENCING MEMORANDUM
*KELLEY*, CR 18–00532 MMC

5

he experiences is in large part chronic and with no quick fix. He also has a history of traumatic brain injury and had tinnitus. Larouche Decl., Ex B at 2, 4. Because of his physical pain, Mr. Kelley was prescribed pain medications while on duty and upon his return. PSR ¶ 67.

Emotionally, Mr. Kelley was used to suppressing pain and that mentality merged well with the ethos of the Marines. He played "tough guy" to the outside world, but he struggled internally. PSR ¶ 70. In Afghanistan, he witnessed the rawness of war. Larouche Decl. ¶ 5. He held a little girl who died in his arms after she drowned. *Id.* He saw combat. *Id*. He was near blasts while sweeping for IEDs. *Id*. These are difficult experiences to forget. And, like many soldiers in the wars waged in Iraq and Afghanistan, Mr. Kelley was deployed multiple times, which raised the risk of mental trauma from exposure to war. *See* David Wood, *Moral Injury*, Huff Post, Mar. 18, 2014.[4] PSR ¶ 82.

Mr. Kelley has been diagnosed with Post-Traumatic Stress Disorder in light of his experience at war and his childhood. Larouche Decl., Ex. B at 3. His experience aligns with statistics that "suggest a massive and widespread wartime trauma," in those who served in Iraq and Afghanistan. *See* Wood, *Moral Injury*. U.S. Department of Veterans Affairs statistics show that while 52,000 individuals were physically wounded, between 275,000 and 500,000 were affected by PTSD. *Id.* (chart: The Wounds That Don't Show). A growing area of research has also exposed a new set of war trauma symptoms from what is characterized as "moral injury." *See id.*; David Brooks, *The Moral Injury*, The New York Times, Feb. 17, 2015.[5] Soldiers come back from war with PTSD symptoms including fear, but they may also experience symptoms of anger, sorrow, shame, and alienation from having seen or participated in acts that are so contrary to the customary sense of morals and ethics in non-war settings. *See* Wood, *Moral Injury* (explaining the overlap of PTSD and moral injury war trauma symptoms). Mr. Kelley was exposed to moral injury when he saw needless loss of human lives, including women and children and gruesome scenes of war. Larouche Decl., ¶ 5. These experiences are not easy to let go and contribute to Mr. Kelley's trauma. However, he hopes to take one professor's suggestion of moving forward with "deeds of atonement," and "re-establish[ing] loyalty," including "renewing one's commitment to being a good parent [or] serving the needy in

---

[4] Available at: http://projects.huffingtonpost.com/projects/moral-injury/the-grunts
[5] Available at: https://www.nytimes.com/2015/02/17/opinion/david-brooks-the-moral-injury.html

SENTENCING MEMORANDUM
*KELLEY*, CR 18–00532 MMC

6

one's community." Aaron Pratt Shepherd, *For Veterans, a Path to Healing 'Moral Injury,'* The New York Times, Dec. 9, 2017.[6] Mr. Kelley's military service and related physical and mental health issues should be considered in applying a variance.

### 3. Addiction to prescription drugs and then street drugs and Mr. Kelley's altered mental state led to his commission of the instant offense.

The medical treatment Mr. Kelley received during and after his service, included prescription pain medications that Mr. Kelley became dangerously addicted to. ¶ 59. Around 2014, Mr. Kelley's treatment providers informed him they could no longer prescribe the medication and certainly not at the increasing doses Mr. Kelley felt he needed due to addiction. *See* PSR ¶ 76. Mr. Kelley headed to the streets to fulfill his addiction. For a while, he bought the same or similar pills that he had been prescribed. *Id*. But then, those became too expensive and he started using street drugs, including heroin. *Id.* For a while, he tried a Suboxone detox program with the Veteran's Clinic in 2015. PSR ¶ 77. Time went by where it looked like he was making gains in recovery, but then he would relapse. He also participated in an outpatient methadone program, again making some progress, but then relapsing, leading to the present offense. PSR ¶ 77. The "detox" programs weren't enough for him. He waited in line. He signed some papers. Maybe spoke to someone briefly, but then he got his fix and left. Mr. Kelley needed more to overcome his addiction.

Mr. Kelley's deep fall into addiction may have been avoided had he received mental health treatment upon his return home. A study published in the Journal of the American Medical Association ("JAMA") shows that veterans returning from Afghanistan and Iraq had comorbid mental and physical health problems and that those with PTSD were more likely to be prescribed opioid treatment, but that a mental health diagnosis actually made opioid treatment higher-risk. Seal, Shi, et al., *Association of Mental Health Disorders with Prescription Opioids and High-Risk Opioid Use in US Veterans of Iraq and Afghanistan*, JAMA, Mar. 7, 2012—Vol. 307, No. 9 at 940[7] ("Among US veterans of Iraq and Afghanistan, mental health diagnoses, especially PTSD, were associated with an increased risk of receiving opioids for pain, high-risk opioid use, and adverse

---

[6] Available at: https://www.nytimes.com/2017/12/09/opinion/for-veterans-a-path-to-healing-moral-injury.html
[7] Available at: https://jamanetwork.com/journals/jama/fullarticle/1105046

clinical outcomes.")[8] The JAMA-published study reported:

> Unfortunately, treatment with opioids among patients with mental health problems may result in or exacerbate substance abuse and worsening of mental health symptoms over time. Our results revealed that veterans with PTSD-prescribed opioids for pain used higher doses for longer periods and experienced substantially more adverse clinical outcomes than veterans with other or no mental health disorders.

*Id*. at 944. Despite the prevalence of PTSD among veterans, "most VA primary care clinicians lack specialized training in the management of comorbid pain and PTSD." *Id*. at 944. In short, Mr. Kelley's PTSD from his childhood history and military trauma may have made him more susceptible to becoming dangerously addicted to pain medication and sadly, military health services may have been ill-equipped to serve veterans like him. This Court should consider the development of Mr. Kelley's addiction in finding a variance is warranted.

### 4. Since receiving treatment, Mr. Kelley has demonstrated significant pre-sentence rehabilitation.

After finally beginning to address his past traumas and addiction head-on, Mr. Kelley is getting back to his best and sober self. But for one incident of cocaine use in December 2019, he has been sober for 20 months. PSR ¶ 80. Mr. Kelley committed the instant offense in July 2018, but things did not start turning around until after he served a state sentence in Maryland and then was brought in for his federal matter in July 2019 and ordered released to the Newbridge treatment facility in Berkeley. *See* PSR at 2, ¶ 5. During the 90-day in-patient program at Newbridge, Mr. Kelley had to talk about his past and his emotions for the first time. He worked with a social worker, participated in a 12-step program at Recovery Dharma in San Francisco, went to the VA for mental health treatment, attended a weekly Veteran's group for behavioral health, and participated in drug screens and Addiction Recovery Treatment Services. PSR ¶ 69. Mr. Kelley worked on addressing his various diagnosis, including ADHD, depression, PTSD, and traumatic brain injury. *Id*.; Larouche Decl., Ex. B at 3. For someone who had not received mental health and in-patient substance abuse therapy, Mr. Kelley was

---

[8] receiving prescription opioids was associated with increased risk of adverse clinical outcomes for all veterans returning from Iraq and Afghanistan, especially for veterans with PTSD, who were at highest risk of

SENTENCING MEMORANDUM
*KELLEY*, CR 18–00532 MMC

8

overwhelmed. But he also saw that this was what he had been missing when he previously tried to overcome his addiction. He also worked on developing mindfulness skills to monitor himself and better self-regulate. Larouche Decl., Ex. B at 3. He successfully completed Newbridge, continued outpatient treatment, and began steady employment with ABC Bus Companies. PSR ¶¶ 69, 85. But for one incident when Mr. Kelley succumbed to an offer of cocaine in December 2019, he has been sober since November 2018—20 months. PSR ¶ 80. Mr. Kelley has no other incidents while on pre-trial release.

In March 2020, Mr. Kelley was permitted to move back to Baltimore to be with his fiancée. He has shown he can maintain his sobriety and mental health treatment, even during the challenges of the COVID-19 pandemic. He participates in a weekly substance abuse group call and attends 12-step substance abuse meetings. PSR ¶ 79. He made the effort to enroll with Veterans Services and is doing one-on-one PTSD counseling. PSR ¶ 70; Larouche Decl., Ex. C. Mr. Kelley has found counseling is critical for him he wants to continue with therapy in the future. PSR ¶ 70. His fiancée, Ms. Russell, is also seeing the positive developments in Mr. Kelley because of his engagement in counseling and developing coping mechanisms. PSR ¶¶ 64, 72.

Although Mr. Kelley has been unemployed since returning to Maryland, and notwithstanding the pandemic, he has not been idle. As Ms. Russell notes, Mr. Kelley enjoys donating his time to help others. PSR ¶ 58. He recently created a charitable organization called "Shepherd's Order," that is helping provide food to those in need and he brings groceries to the homeless. *Id*. His good deeds also extend to his family, including his fiancée's elderly mother. *Id*.

Finally, Mr. Kelley has been working on rebuilding his relationships. He is taking steps to regain at least visitation of his 7-year-old daughter, Shannon, who is the light of his life. Mr. Kelley was a deeply-engaged father despite his divorce from his ex-wife. PSR ¶ 59. He took her to ballet and piano lessons and loved spending time with her. PSR ¶¶ 59–60. Mr. Kelley misses her daughter dearly and is motivated to do what he needs to do after not

**Mr. Kelley with his daughter, Shannon.**

seeing her since November 2018. PSR ¶¶ 59, 63. He is also grateful for the continued support of his fiancée, with whom he lives. Regarding his family, Mr. Kelley is in contact with several family members, especially as part of his healing process to forgive and move forward. *See* PSR ¶ 20, 50, 62.

Mr. Kelley takes full responsibility for his actions in his offense. He is ashamed that his addiction brought him at such a low. PSR ¶ 20. Nonetheless, he remains optimistic about his future. He is close to finishing his college degree, he has a strong work ethic, he is staying sober, and is motivated to be there for his family, especially for his fiancée and young daughter. Mr. Kelley's pre-sentence rehabilitation should merit a variance.

**B.     The other 3553(a) factors, including the nature of the offense, the need for deterrence, protection of the public, and Mr. Kelley's need for medical and effective correctional treatment, also suggest that a variance is appropriate.**

The other 3553(a) sentencing factors also support a variance in this case. As to the nature of the offense, that Mr. Kelley was found on the side of the highway with drugs, and that he had firearms with him, is of course concerning. The drug he was transporting, however, was marijuana and not a more serious or dangerous drug. PSR ¶ 14. Mr. Kelley also informed the officers of the firearms in his vehicle, mitigating a concern for potential danger. PSR ¶ 12. He disclosed to officers that he was the transportation piece for the load of marijuana and there is no indication of any other drug trafficking. PSR ¶ 15. What is apparent is that Mr. Kelley was so deeply addicted that he was compelled to pull over on the side of the busy freeway so he could use drugs. PSR ¶ 7, 14. Finally, his offense does not suggest any violence by Mr. Kelley.

Mr. Kelley's history makes clear that he needs mental health treatment and a serious in-patient program to fully address his trauma and related addiction. The treatment process is now working. He is grappling with his past instead of "keep[ing] his emotions bottled up." PSR ¶ 70. It is this treatment and services that is changing his behavior. A longer period of incarceration will not positively impact his behavior. The Department of Justice National Institute of Justice has recognized that increasing the severity of punishment does little to deter future crime. National Institute of Justice, *Five Things*

*About Deterrence*, May 2016.[9] Regarding protection of the public, since his pre-trial release over a year ago, Mr. Kelley has shown he is not a danger to the public. The best way to maintain that course is to have Mr. Kelley access mental health treatment and positive support networks. A longer term of incarceration is not necessary to ensure protection of the public.

Section 3553(a)(2)(d) also directs the Court to consider the need for the sentence to provide Mr. Kelley with medical care or other correctional treatment in the most effective manner. Mr. Kelley is in need of care and correctional treatment that addresses his mental health issues, including PTSD and depression, and his addiction. The COVID-19 pandemic remains a present danger and hindrance to the BOP providing its normal services to inmates. Because of the pandemic, as of now, Mr. Kelley would not be able to access the usual and necessary treatment programming in BOP. Accordingly, the Court should consider the need to provide Mr. Kelley with therapy, PTSD, and substance abuse treatment and the accessibility of such correctional treatment when determining the sentence. Mr. Kelley respectfully requests that he be able to self-surrender at a later date once the risks of the pandemic have subsided.

## CONCLUSION

Mr. Kelley is a loyal, caring person who has endured substantial trauma. Despite his difficult childhood, he finished high school, participated in some college courses, and enlisted in the military. In the Marine Corps, he found a family to be loyal to and a mission to commit to. He suffered physical and emotional pain, but is very proud of the time he spent in the military. Sadly, he did not get the treatment he needed and he became addicted to drugs. He lost everything and lost himself, but through the intervention of this case and his hard work, he is living a sober life. He is motivated to serve others again, including his community and his fiancée and daughter. Here, a below-guideline sentence of 24 months custody, in conjunction with supervised release that includes treatment conditions, will achieve the goals of federal sentencing and be sufficient but not greater than necessary.

---

[9] Available at: https://www.ncjrs.gov/pdffiles1/nij/247350.pdf

| | |
|---|---|
| Dated:    August 26, 2020 | Respectfully submitted,<br><br>STEVEN G. KALAR<br>Federal Public Defender<br>Northern District of California<br><br>            /S<br>ELISSE LAROUCHE<br>Assistant Federal Public Defender |